**BANANA DISTRIBUTORS, Incorporated, Plaintiff,**

v.

**UNITED FRUIT COMPANY; and Fruit Dispatch Company, Defendants.**

United States District Court
S. D. New York.
May 8, 1958.

See also, 19 F.R.D. 532.

34

Smith, Mathews, Bell & Solomon, New York City, for plaintiffs, Blackwell Smith, Ernest Leff, Arnold Fortas & Porter, Thurman Arnold, Washington, D. C., of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendants, Theodore Kiendl, Ralph M. Carson, Porter R. Chandler, Edwin J. Jacob, David G. Gill, David L. Farley, Jr., New York City, of counsel.

LEVET, District Judge.

This is an action for treble damages under the antitrust laws. The case was tried before a jury after a preliminary trial in reference to the statute of limitations, likewise before a jury, pursuant to Bertha Building Corporation v. National Theatres Corporation, 2 Cir., 1957, 248 F.2d 833, certiorari denied April 28, 1958, 78 S.Ct. 777. On the basis of the jury's factual conclusions in the preliminary trial this court determined that a three-year New York statute, Civil Practice Act, § 49, controlled. See Banana Distributors Inc., v. United Fruit Company and Fruit Dispatch Company, D.C. S.D.N.Y.1958, 158 F.Supp. 153; 158 F. Supp. 160. After a trial of the main issues lasting some thirty-nine court days, the jury disagreed. Motions by defendants under Rule 41(b) and Rule 50 of the Federal Rules of Civil Procedure, 28 U.S.C.A. are now to be determined.

The only litigants involved at the conclusion of the trial were Banana Distributors Incorporated, plaintiff, and United Fruit Company and Fruit Dispatch Company, defendants, the action having been dismissed as to all other parties. The plaintiff, Banana Distributors Incorporated, is a banana jobber, with its business located in Hartford, Connecticut. Defendant United Fruit Company produces bananas in the Central American tropics and transports them to the United States, where the defendant Fruit Dispatch Company distributes the fruit.

On January 24, 1958, at the close of plaintiff's case, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, the defendants severally moved for dismissal upon the merits on the ground that upon the facts and the law the plaintiff had shown no right to relief. Following argument, decision was reserved. At the close of all the evidence, the defendants renewed their previous motions and further moved for a directed verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure, on which, after argument on February 11, 1958, decision was also reserved. After disagreement of the jury, these motions were renewed by the defendant on February 20, 1958. Subsequently, briefs and arguments thereon were presented on March 3, 1958.

Plaintiff claims that defendants, United Fruit and Fruit Dispatch, have monopolized and have conspired to monopolize and to restrain trade with respect to the importation and distribution of quality green bananas in the United States, and more particularly, in the Eastern Division of Fruit Dispatch and the State of Connecticut. Plaintiff alleges that United Fruit and Fruit Dispatch had monopoly control over the supply of bananas and have abused their monopoly power in various unlawful ways, described hereinafter, thereby causing damage to plaintiff.

Plaintiff contends that the evidence sustains the following claims against the defendants:

(1) That the defendants maintained and conspired to maintain an allocation system in the sale of bananas which deprived plaintiff of competitive access to the market;

(2) That as a result of this allocation system, defendants refused to sell plaintiff an adequate supply of bananas to operate its plants at a profit;

(3) That the defendants monopolized and conspired to restrain trade and monopolize—

(a) By fixing and stabilizing prices;

(b) By refusing to sell;

(c) By coercing jobbers to buy during periods of glut;

(d) By granting rebates to certain customers;

(e) By forcing jobbers to accept bananas either greater in quantity or lower in quality than such person would otherwise accept;

(f) By penalizing jobbers because of purchases by them from competitors of defendants;

(g) By dumping bananas in order to fix and stabilize prices;

(h) By selling bananas on the condition or understanding that the jobber will

comply with any instructions of the defendant Fruit Dispatch Company as to persons to whom the bananas may be sold by the jobber or the areas in which the jobber may sell the bananas purchased by him;

(i) By allocating bananas;

(j) By refusing to grant competitive access to defendants' banana supply;

(k) By requiring jobbers to buy inferior bananas at first-class prices;

(4) That Fruit Dispatch Company and United Fruit Company, defendants, and Thomas Kalliches, Inc., not a defendant, conspired to refuse to sell bananas or to reduce sales to plaintiff in order to restrain and suppress competition between plaintiff and other jobbers;

(5) That United Fruit Company and Fruit Dispatch Company, defendants, and Canadian Banana Company and Meloripe Company, not defendants, conspired to fix and stabilize prices by dumping bananas. (See Plaintiff's Requested Instructions to Jury, Nos. 3 and 4.)

In substance, the plaintiff has advanced two legal theories upon which to predicate a recovery for but a single set of allegedly illegal practices. The gravamen of plaintiff's action, whether viewed from the standpoint of alleged monopolization or conspiracy is:

(1) Price fixing;

(2) Refusal to sell;

(3) Use of an allocation system which, it is claimed, involved both of the above in such a manner as to preserve defendants' effective market control over both the supply and price of quality green bananas.

The defendants contend, and sought at the trial to prove, that their distribution system did not involve price fixing or any illegal refusal to sell but, on the contrary, represented a legitimate business practice necessitated by the nature of the banana business; that it was established to distribute bananas as equitably as possible among all of defendants' customers during periods of shortage; and that the plaintiff at all times received a fair and equitable share of the available banana supply.

Likewise, the defendants claim and sought to prove that they attained their position of leadership in the banana market by superior skill, efficiency and scientific application. They assert that their dominance, if any, in the banana business was thrust upon them. However, the question is not how the defendants acquired their position of leadership, but, rather, whether that position gave them monopoly control over the market. If so, such dominance may have made otherwise valid business practices actionable. Congress, in the passage of the anti-trust laws, has adopted a policy of control of economic organization and business practice to which all must adhere. The purposes of Congress in passing this legislation was to use its constitutional power "to make of ours, so far as Congress could under our dual system, a competitive business economy." United States v. South-Eastern Underwriters Ass'n, 1944, 322 U.S. 533, 559, 64 S.Ct. 1162, 1177, 88 L.Ed. 1440.

For the purposes of determination of these motions, it appears that there was evidence from which a jury might conclude that during the pertinent three-year period, September 3, 1950 to September 3, 1953, (1) the defendants possessed monopoly power over the supply of quality green bananas in the Connecticut market; (2) the defendants exercised allocation or partial refusal to sell; (3) the defendants fixed prices; (4) the defendants' distribution system was operated in such a manner as to preserve United Fruit's effective market control over both the supply and price of quality green bananas.

By reason of the foregoing considerations with respect to alleged monopolization, dismissal is not appropriate. Consequently, a review by the court of the sufficiency of plaintiff's claims with respect to conspiracy is unnecessary to the decision of the present motions. Accordingly, the discussion which follows is devoted exclusively to a consideration of

plaintiff's claims with respect to defendants' alleged monopoly power and the asserted abuse thereof.

### Legal v. Illegal Refusal to Sell

In the absence of conspiracy or monopoly, an individual trader has full freedom to refuse to sell to any person for any reason. See United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992. The exercise of control over customers to protect the seller's goodwill and his product is not illegal per se. It has been said that it is of the essence of competition that the manufacturer or wholesaler should and does have wide freedom in maintaining the quality of his distribution system. See 103 University of Pennsylvania Law Review 847, 859, "Refusals to Deal under Federal Antitrust Law," by Charles F. Barber. Refusals to sell without more do not violate the law. Times-Picayune Publishing Company v. United States, 1953, 345 U.S. 594, 624–625, 73 S.Ct. 872, 97 L.Ed. 1277. A trader or manufacturer has a right to develop its enterprise intelligently by promoting productive business relationships and channels of distribution, while abandoning those which are relatively barren. See Miller Motors, Inc., v. Ford Motor Company, D.C.M.D. N.C.1957, 149 F.Supp. 790, 808–809, affirmed 4 Cir., 1958, 252 F.2d 441.

A single producer in a purely competitive market will ordinarily sell to all comers and is free not to do so if it chooses; but the situation is different when the producer has a substantial degree of monopoly power stemming from comparative size. "Within the limits of his monopoly position the producer can use refusal to sell as a device to influence prices. Moreover he has a weapon with which to extend his power over the market." See 58 Yale Law Journal 1121, "Refusals to Sell and Public Control of Competition." Refusal to sell on the part of a producer having monopoly control in order to influence prices or to maintain or extend its effective market control is illegal, as is any other device designed to accomplish these ends. See United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 427–428.

Whether or not the defendants may be considered as a "single trader" is, therefore, not decisive. Even if the relationship of United Fruit Company and its subsidiary sales agent, Fruit Dispatch Company, by reason of the agency contract (Defendants' Exhibit A–4), constitutes only one unit—that is, a single trader—the defendants might still be liable under proof of monopoly power, exercised to accomplish an illegal purpose.

In Klor's, Inc., v. Broadway-Hale Stores, Inc., 255 F.2d 214, decided by the United States Court of Appeals for the Ninth Circuit on March 28, 1958, a distinction was drawn between a refusal to sell which might result in an invasion of a private right without constituting a public wrong, and a refusal to sell which constituted both a private and a public wrong. The former was held not to be actionable under the antitrust laws. No question of monopoly power or the illegal abuse thereof was involved, nor was it there alleged that the refusal to sell affected the price, quantity or quality of the product either directly or indirectly.

In the case at bar, there is proof from which a jury might conclude that the defendants engaged in refusals to sell which may have served to perpetuate defendants' market status and to affect the price of bananas ultimately charged to the consuming public. It is clear, therefore, that, at least for the purpose of these motions, the refusals to sell (or partial refusals to sell) with which the defendants are charged, when considered with attendant facts and circumstances here present, may have constituted, per se, both a private wrong to the plaintiff and a public wrong actionable under the treble damages provision of the antitrust law (Title 15 U.S.C.A. § 15).

### Monopoly Power

There was, as I have said, sufficient evidence from which the jury could have

held that the defendants had a monopoly power over the importation of bananas into the State of Connecticut in the period involved in this law suit. According to Plaintiff's Exhibit 53, the importations by water of bananas into the United States by the United Fruit Company constituted the following percentage of all such water-borne imports of bananas:

| | |
|---|---|
| 1950 | 73% |
| 1951 | 70.3% |
| 1952 | 65.5% |
| 1953 | 65.2% |

Plaintiff's Exhibit 58 showed the weekly imports of bananas into the Eastern Division based on weight and compares the United Fruit Company importations with those of Standard Fruit Company and other competitors.

The defendants, by Exhibit W–3, entitled, "Water-Borne Arrivals of Bananas into the Port of New York in Terms of Stems," contend that importations of Fruit Dispatch in percentage in relation to competitors declined from 80% of all banana importations in 1948 to 61% in 1952, while competitors' importations increased from 20% in 1948 to 39% in 1952. Thus, at least 61% of total imports in stems into the Port of New York were brought in by the defendants.

It appears that in 1950, Standard Fruit sold 3,501,605 pounds of bananas in Connecticut from their port of entry in New York, including 16,702 stems listed as being other than green bananas. (Plaintiff's Exhibit 57, p. 12) In the fiscal year ending October 31, 1950, plaintiff purchased 6,014,188 pounds of green bananas. (Plaintiff's Exhibit 97)

In 1951, the total poundage of Standard Fruit bananas entered at New York and sold in Connecticut, including 34,663 stems listed as being other than green bananas, was 6,152,335 pounds. (Plaintiff's Exhibit 57, p. 29) Plaintiff's purchases of green bananas for the fiscal year ending October 31, 1951 was 5,926,-852 pounds. (Plaintiff's Exhibit 97)

In 1952, the total poundage of Standard Fruit bananas entered at New York and sold in Connecticut, including 40,690 stems listed as being other than green bananas, was 7,339,553 pounds (Plaintiff's Exhibit 57, p. 46) Plaintiff's purchases of green bananas for the fiscal year ending October 31, 1952 was 4,611,-053 pounds. (Plaintiff's Exhibit 97)

From January through September of 1953, Standard Fruit sold in Connecticut 4,451,066 pounds of bananas entered at New York, including 30,466 stems listed as being other than green bananas. (Plaintiff's Exhibit 57, p. 58) Plaintiff's purchases of green bananas for the fiscal year ending October, 31, 1953 was 4,889,-660 pounds. (Plaintiff's Exhibit 97)

In respect to monopoly power of the defendants and its effect upon Banana Distributors Incorporated, the plaintiff submited certain other evidence, including the following: Cos Masters, president of Thomas Kalliches, Inc., testified that in his opinion it would not have been possible during the period 1946 to 1953 for a substantial jobber to have conducted his business in supplying customers in the Eastern Division of the United States without getting supplies of bananas from Fruit Dispatch. (S.M. 162) Percival B. Elbaum, president of the plaintiff, also testified to a similar condition. (S.M. 3186) Out of many importers, only R. B. Dixon & Company, Standard Fruit and Steamship Company and Eastern Banana Company were able to bring in comparatively regular supplies. (See Plaintiff's Exhibits 29, 54, 56, 58, 60) Elbaum apparently purchased some bananas from competitors in 1951, 1952 and 1953. (S.M. 816–817) In the opinion of Masters, the general quality of the fruit imported by Standard Fruit, for example, was far below that of United Fruit. (S.M. 136–138) Masters, in comparing the quality of bananas imported by Fruit Dispatch and Standard Fruit, said that the Standard bananas had more gold than green, were horribly marked, bruised, scarred, contained insect marks, maceration marks, etc. (S.M. 138) and that the Standard Fruit Company's best, the Frisco, was not com-

parable to United Fruit Company's Fortuna. (S.M. 140) R. B. Dixon & Company brought in Ecuador bananas, which did not have the desirability of the Central American varieties. (S.M. 158–159)

Defendants' profit margin is another factor which may properly be considered by a jury in determining whether the defendants had monopoly power. See United States v. General Electric Co., D.C.D.N.J.1949, 82 F.Supp. 753, 895. In this regard, plaintiff contended that the profit per dollar of sales by United Fruit in the United States rose from 20% in 1941 to 47% in 1947, although receding to 31% in 1952. (See Plaintiff's Exhibits 63, 64, 115) On the other hand, defendants claimed that United Fruit's profits, calculated upon its net worth, asserted to be a more reliable basis, were not at all unreasonable. See Defendants' Exhibits D–3A, J–3, K–3, I–3; S.M. 4421–4428.

The exact proportion of defendants' share of the market may be open to some question. For example: (1) There is some uncertainty by reason of the use of varying comparisons based upon terms of weight and those based upon number of stems. The defendants contend that number of stems afford a more accurate basis of comparison, while the plaintiff urges the use of weight; (2) The defendants point out that arrivals for Canadian and Southern Division customers are excluded and that shipments into the Eastern Division from the Southern Division arrivals are excluded, referring to minutes, pp. 987–989, Plaintiff's Exhibit 60; (3) The defendants assert that Plaintiff's Exhibits 53 and 58 not only are fallacious because of the weight as against stems alleged inaccuracy, but because the testimony in respect to the quantity brought in by other importers is conjectural, referring to minutes, pp. 327–328.

While the proof which was adduced is subject to certain attack, it is my opinion that a factual issue thereon exists which, for the purposes of these motions, cannot be disregarded.

## Price Fixing

The question of whether the defendants engaged in price maintenance or stabilization is a critical issue in this case, first, because price fixing combinations or agreements are illegal per se— Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219; e.g., United States v. Socony-Vacuum Oil Co., Inc., 1940, 310 U.S. 150, 222–223, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 397–401, 47 S.Ct. 377, 71 L.Ed. 700; second, because the ability to fix or control prices is an indicia of monopoly power—see United States v. E. I. Du Pont De Nemours & Co., 1956, 351 U.S. 377, 389, 391, 76 S.Ct. 994, 100 L.Ed. 1264; and third, because price fixing constitutes an illegal abuse of monopoly power—see United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 427–428.

The defendants contend that while their asking price remained constant, the prices received by them in the Eastern Division varied. Some variation is undoubtedly inevitable in the price of a perishable commodity, the supply of which is subject both in quantity and quality to the exigencies of nature. The test is not whether the prices received by the defendants were absolutely rigid, but, rather, whether they were abnormally rigid in view of the nature of the commodity sold.

The following table, compiled from Defendants Exhibits U–2 and V–2A, indicates that there was a substantial rigidity in the prices received by the defendants in the Eastern Division for their first-class green bananas during the period from January 1951 through August 1953:

| Date | Per Cent of Conn. Sales of Standard Fruit Bananas Which Were at or Above $7.50 | Per Cent of Eastern Division Sales of United Fruit Bananas Which Were at Full Seaboard Price ($7.50) | Per Cent of United Fruit Bananas Sold in the Eastern Division Which Were First-Class Green Fruit | Average Price Obtained by United Fruit for First-Class Green Fruit |
|---|---|---|---|---|
| **1951** | | | | |
| January | 16.5 | 90 | 90 | $ 7.50 |
| February | 54.2 | 89.8 | 90 | $ 7.50 |
| March | 74.9 | 93.5 | 94 | $ 7.50 |
| April | 68.4 | 95.1 | 95 | $ 7.50 |
| May | 76.2 | 94.6 | 95 | $ 7.50 |
| June | 77.5 | 75.1 | 96 | $ 7.40 |
| July | 46.6 | 88.2 | 89 | $ 7.48 |
| August | -- | 84.1 | 84 | $ 7.50 |
| September | 82.6 | 86.4 | 87 | $ 7.50 |
| October | 51.7 | 75 | 90 | $ 7.42 |
| November | 15.2 | 73.6 | 88 | $ 7.42 |
| December | -- | 79.7 | 80 | $ 7.50 |
| **1952** | | | | |
| January | 58.4 | 81.9 | 82 | $ 7.50 |
| February | 91.7 | 87.7 | 88 | $ 7.50 |
| March | 89 | 91 | 91 | $ 7.50 |
| April | 90.6 | 91.4 | 93 | $ 7.50 |
| May | 40.9 | 93.8 | 95 | $ 7.50 |
| June | 26.7 | 85.9 | 86 | $ 7.50 |
| July | 14.9 | 78 | 81 | $ 7.47 |
| August | 35.1 | 78.3 | 82 | $ 7.45 |
| September | 21.6 | 63.1 | 78 | $ 7.07 |
| October | -- | 49.7 | 77 | $ 6.66 |
| November | 52.9 | 78.3 | 85 | $ 7.37 |
| December | 50.7 | 72 | 89 | $ 7.11 |
| **1953** | | | | |
| January | 51.2 | 74.7 | 89 | $ 7.24 |
| February | 100 | 90.4 | 90 | $ 7.50 |
| March | 93.8 | 90.3 | 90 | $ 7.50 |
| April | 91.6 | 92.3 | 92 | $ 7.50 |
| May | 67.7 | 91.6 | 92 | $ 7.50 |
| June | 64.6 | 92.4 | 93 | $ 7.50 |
| July | 61.3 | 90.1 | 90 | $ 7.50 |
| August | 74.1 | 91.3 | 91 | $ 7.50 |

Underlined Figures Are for Average Monthly Sales Prices under the Full $7.50 Seaboard Price.

See Defendants' Exhibits U–2, V–2A.

# 41

It appears from the foregoing table that:

(1) The defendants obtained an average price of $7.50 per hundredweight for Eastern Division sales of first-class green bananas in 21 out of the 32 months from January 1951 through August 1953;

(2) The defendants received an average price of $7.40 or over per hundredweight in 27 out of the 32 months during this period;

(3) They secured an average price of at least $7.07 per hundredweight in 31 out of the 32 months during this period;

(4) In 20 months out of the 32-month period, the defendants were paid the full seaboard price for all or practically all of their first-class green fruit sold in the Eastern Division;

(5) In 14 out of the 32 months, 90% or over of all United Fruit bananas sold in the Eastern Division were at full seaboard price;

(6) In 21 out of the 32 months, 80% or over of all United Fruit bananas vended in the Eastern Division were at full seaboard price;

(7) In 27 out of the 32 months, 75% or over of all United Fruit bananas marketed in the Eastern Division were at full seaboard price;

(8) In 30 out of the 32 months, 72% or over of all United Fruit bananas sold in the Eastern Division were at full seaboard price;

(9) The percentage of United Fruit bananas sold in the Eastern Division at $7.50 per hundredweight during the period from January 1951 through August 1953 appears to have been considerably higher than the percentage of Standard Fruit bananas sold in Connecticut at or above this price.

The validity of the foregoing chart insofar as it seeks to compare Standard Fruit sales with those of United Fruit is to some extent subject to attack on the ground that the United Fruit percentages represent sales in the entire Eastern Division, whereas those of Standard Fruit cover only sales in Connecticut. However, it does not appear that the percentage of United Fruit bananas sold at full seaboard price in Connecticut was less than the percentage sold at that price in the Eastern Division as a whole.

Plaintiff's Exhibit 41 may indicate the contrary. From this exhibit it appears that in the interior branches of the Eastern Division, including the Hartford branch, United Fruit first-class bananas sold at the full seaboard price in all weeks during 1948, 1949 and 1951. In 1950, the full seaboard price was obtained in 47 out of the 52 weeks. In 1952, the full seaboard price was obtained in 41 out of the 52 weeks.

The defendants may, perhaps with some justification, argue that a smaller percentage of Standard Fruit bananas sold at a price of $7.50 per hundredweight than did those of United Fruit because the general quality of Standard Fruit bananas was inferior to those of United Fruit. To do so, however, might, on the other hand, emphasize the degree to which the defendants may have preempted the Connecticut market in quality green bananas.

The defendants have argued that the relative stability of the price level for their bananas resulted not from any price fixing scheme, but, rather, from the reasonableness of their asking price. However, this is a question of fact which must be left to the determination of a jury.

Certain other phases of proof presented by plaintiff may bear on price fixing. For example:

(1) Alleged dumping in Canada and in Massachusetts through Meloripe Fruit Company, a subsidiary of defendants. The impact of the Canadian aspects of this alleged practice is weak. See Plaintiff's Exhibits 40, 52, 111; S.M. 254, 528–531, 924, 928–930, 1425, 1426, 1504, 1505, 1506, 1669, 3764–3766, 3770. As to Meloripe, some relationship to proof of possible price fixing may exist. See Plaintiff's Exhibits 40, 46, 149; S.M. 947–950, 956, 963, 968, 1643–1647.

(2) Plaintiff's proof to the effect that defendants in 1950 in a glut period al-

legedly induced certain jobbers to buy available fruit at the full seaboard price in return for a promise to permit such jobbers to secure supplies in times of scarcity and in return for subsidy payments totalling $125,000, subsequently made. (S.M. 202–206, 247–254, 1650–1653)

### Allocation or Distribution System

In the post-war period Fruit Dispatch Company, United Fruit Company's subsidiary corporation and sales agent, allocated bananas among the thirteen branches in the Eastern Division on an historical basis, although this might be determined as of a particular moment. (Testimony of Joseph H. Roddy, vice-president of Fruit Dispatch, S.M. 1455–1456) Each division manager was then completely free to "allocate" as he chose during any period of shortage. (S.M. 1457) The most recent normal supply situation might be used as a basis for distribution. (S.M. 1460) Connecticut purchasers were expected to purchase only through the Hartford branch and not through the New York office. (S.M. 1478)

Elbaum testified that every Friday when Fruit Dispatch called him up, he was told he could only buy what was allocated for the following week. (S.M. 703–704) He said John Madison, the branch manager of Fruit Dispatch at Hartford until April of 1951, would tell him that out of the ships arriving in port the following week Elbaum was to have so many cars of certain varieties. (S.M. 705) Madison said that the company during the post-war period might have expected that it was going to have a lot of fruit and then something happened— a blowdown, or a strike in the tropics, or a longshoremen's strike in New York —which would force a change beyond its control. (S.M. 1550–1551)

Plaintiff's assertion that an auction system such as that which was abandoned by the defendants in April of 1942 is the only legal distribution method available to the defendants is, in my opinion, untenable. See United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 164, 68 S.Ct. 915, 92 L.Ed. 1260. Such a method may be inequitable to small banana jobbers and may in fact result in increased concentration of economic power among a few powerful jobbers. This is so because if bananas must go to the highest responsible bidder, those with the greatest purchasing power would seem to be in a favored position in times of scarcity.

An allocation system alone, without further factors, is not inherently illegal as a method of distribution in times of scarce supply. See Rogers v. Douglas Tobacco Board of Trade, Inc., 5 Cir., 1957, 244 F.2d 471, 479. Nevertheless, an allocation system is illegal if used by a producer having monopoly power as a device to influence prices or to maintain or extend effective market control. See United States v. Griffith, 1948, 334 U.S. 100, 106–107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 427–428; United States v. United Shoe Machinery Corp., D.C.D.Mass.1953, 110 F.Supp. 295, 342, affirmed 1954, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.[1]

Consequently, whether any illegality attached to the defendants' distribution system here involved depends in the first instance upon whether the defendants had monopoly control and used it in the distribution system to control prices or maintain effective market control.

In this regard the jury may also consider the following:

(1) Plaintiff's claim that jobbers who purchased from competitors of defendants received less favorable treatment from Fruit Dispatch in times of scarcity; (S.M. 272, 273, 842, 843, 884, 1570, 1572; Plaintiff's Exhibits 36, 37, 38, 39)

---

1. In Rogers v. Douglas Tobacco Board of Trade, Inc., 5 Cir., 1957, 244 F.2d 471, 478, the court, in upholding the allocation system there involved, stated:

"This case does not involve any plan of market price fixing either directly or indirectly. There is, therefore, no conclusive presumption of illegality."

(2) Plaintiff's assertion that jobbers were urged to purchase in time of glut to insure quotas in time of scarcity; (S.M. 1571)

(3) Defendants' surveillance of jobbers' purchases from competitors. (S.M. 422, 423, 561, 565, 642)

The weight to be credited to such evidence may be questioned, but it cannot be ignored. There is clearly a factual issue here.

### First National Stores Matter

First National Stores is a supermarket grocery chain which operated in the New England area. From 1944 until 1949, the plaintiff received a quota of United Fruit bananas to ripen for First National Stores and thereby derived opportunities to expand plaintiff's market in Connecticut, thus competing in the territory of a fellow-jobber and banana broker known as Thomas Kalliches, Inc. Plaintiff objected to the defendants' withdrawal of this quota at the alleged insistence of Kalliches and contended that the defendants compelled the First National Stores to recommence its own ripening processes for the purpose of restraining plaintiff from competing with the customers of Kalliches.

The plaintiff's original claims with respect to this First National Stores matter, the facts of which are hereafter more fully described, were apparently based both upon the theory of conspiracy and on the alleged abuse of monopoly power. Since, as already indicated herein, there is proof upon the latter theory sufficient to necessitate the denial of these motions, we are not now considering the conspiracy phases. In any event, the plaintiff, faced with a three-year statute of limitations, contends that through the damage period from September 3, 1950 to September 3, 1953, the defendants illegally persisted in a refusal to sell or a partial refusal to sell, with a continued purpose and intent of restraining and preventing plaintiff from competing with customers of Thomas Kalliches, Inc.

Accordingly, I herewith summarize the extensive evidence as to this matter, as follows:

(1) Prior to World War II, First National Stores purchased 10 to 15 carloads of bananas per week from Fruit Dispatch and ripened them in the First National plant at Hartford. At the same time it bought some ripened bananas from plaintiff; (S.M. 1249, 1251–1253, 1254, 1256, 4492–4493A)

(2) In or about 1942, because of war limitations, reduced shipping, lessened importations, etc., First National's Hartford ripening room was closed; (S.M. 4495, 4496)

(3) In 1944, a war-time arrangement was made whereby a quota for First National was delivered by Fruit Dispatch to plaintiff at its New Haven plant for ripening and sale to First National; (S.M. 685, 1632–1638, 1680–1681, 4497–4498, 4500, 4502, 5103, 5105, 5108)

(4) Plaintiff clearly recognized the aforesaid nature of the arrangement; (See Defendants' Exhibits O, P, U)

(5) Apparently, plaintiff, with this supply of additional bananas over and above its own quota, utilized it to extend the plaintiff's market to more distant Connecticut fields; (S.M. 686, 1249, 1632, 1633, 1634)

(6) In 1945, First National reopened ripening rooms in Massachusetts, Maine and New Hampshire (S.M. 4503–4505), and there is definite indication that First National was planning to do so in Connecticut; (S.M. 1559–1560, 1576–1577, 4505–4509)

(7) Thomas Kalliches, Inc., another Connecticut jobber and broker, and certain of its customers complained that plaintiff was using the First National "quota" to sell bananas in territories dominated by Kalliches, while they were unable to get enough bananas; (S.M. 1338–1344, 1488–1490, 1497, 1498a)

(8) Whether the motives of the defendants were to aid Thomas Kalliches, Inc. or to deal fairly with all customers, or to prod First National Stores into an early reopening of its ripening room, or otherwise, a temporary cut to Elbaum of the so-called "First National Stores allotment" was made for one or two weeks;

**44**

(Plaintiff's Exhibit 76; S.M. 1198–1201, 1209–1210, 1217, 1222, 1223, 1239, 1240, 1266, 1294, 3707, 3716, 3717, 3753, 4514–4520, 4972)

(9) In June 1947, a new system of billing was initiated by the defendants. Fruit Dispatch sold bananas to First National Stores, but delivered them to plaintiff. For these bananas Fruit Dispatch billed to First National, plaintiff paid First National, First National paid Fruit Dispatch, and finally plaintiff billed First National for the ripe bananas which it sold and delivered to First National; (S.M. 1295–1297, 1301, 1303, 1305, 1325–1330)

(10) Finally, in August 1949, after some delays, First National opened its newly-constructed Connecticut ripening rooms, whereupon plaintiff's supplies allocated to it for First National by Fruit Dispatch were cut and thereafter Fruit Dispatch supplied First National directly with green bananas for ripening; (S.M. 1332, 1333, 4521–4524)

(11) From then on and more or less continuously, plaintiff sought more bananas for its own ripening rooms at Hartford (having closed its New Haven plant in 1949) and sought to induce Fruit Dispatch to limit the supply of bananas sent by it to First National in order to secure the First National market. Plaintiff sold an increasing *percentage* of its available product (received from various sources and ripened by it) to First National, which was not receiving completely adequate supplies from Fruit Dispatch. (S.M. 1333, 1382–1383, 1387–1415, 5136; see Plaintiff's Exhibit 86; Defendants' Exhibit H–1, pp. 10, 11, 20, 21, 22) In 1953, plaintiff sold a substantially greater quantity of bananas to First National than plaintiff had purchased from Fruit Dispatch. (See Plaintiff's Exhibit 86)

Irrespective of any alleged conspiracy or the alleged continuance thereof during the damage period, there is evidence in this case relating to the alleged abuses of monopoly power, as heretofore considered, on which a jury may predicate possible injury and damage in the three-year damage period if such facts, in their opinion, warrant an award.

### Defense of In Pari Delicto

██ The defendants at the trial raised the defense of In Pari Delicto. They pointed out the following facts:

(1) In March, 1952, as appears from a recorded telephone conversation between Elbaum and one Willard Summers (a Western banana jobber), Elbaum conceded to Summers that what he wanted Werner of United Fruit to do was to hold First National Stores down to three cars of bananas a week so that Elbaum could induce First National to close its plant and let him handle the bananas; (See Defendants' Exhibit H–1, p. 20),

(2) During the same telephone conversation in March, 1952, Elbaum urged Summers to induce Werner to reduce the banana distribution to Kalliches in an effort to restrain the sale of bananas to this competitor of plaintiff, thereby increasing plaintiff's position in the Connecticut market; (See Defendants' Exhibit H–1, p. 22),

(3) In the spring of 1951, according to Lawrence Carpenter, who became the Hartford branch manager of Fruit Dispatch at that time, Elbaum complained because Fruit Dispatch was selling bananas to new customers and that the fruit rightfully belonged to Elbaum.

Two other episodes were referred to by the defendants: One occurred in 1944, at which time Elbaum made an agreement or attempted agreement with Irving Bayer of Bayer Fruit & Produce Company (a banana jobber) by which Elbaum was to refrain from competing in certain areas and Bayer was to cover certain areas. See Defendants' Exhibits W and C–4. The second occurred in 1948, when, according to Kenneth E. Redmond, now president of United Fruit, Elbaum proposed to take over the distribution of bananas in the Hartford area for the defendants.

Since these matters occurred before September 3, 1950, they have little weight or merit in connection with this defense.

What their import may have been prior to September 3, 1950, is not pertinent here.

As to the other features above mentioned, it appears:

(1) That the plaintiff's activity was confined for the most part to declarations of its wishes with respect to the distribution of bananas sought to be obtained from the defendants;

(2) That whatever benefits plaintiff may have received from the allocation system presumably were derived in the normal course of business and involved no affirmative act of conspiracy on its part;

(3) That to obtain an adequate supply of suitable bananas plaintiff was probably required to participate in the distribution used by defendants.

In any event, the effectiveness of In Pari Delicto as a defense has been considerably limited by the decisions in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, and Moore v. Mead Service Co., 10 Cir., 1951, 190 F.2d 540, certiorari denied 1952, 342 U.S. 902, 72 S.Ct. 290, 96 L.Ed. 675. See Trebuhs Realty Co., Inc., v. News Syndicate Co., Inc., D.C.S.D.N.Y.1952, 107 F.Supp. 595, 599; Interborough News Co. v. Curtis Pub. Co., D.C.S.D.N.Y.1952, 108 F.Supp. 768; 42 Virginia Law Review 785, "The Unknown Quantity in Private Anti-Trust Suits—The Defense of In Pari Delicto." But see 29 N.Y.Univ.Law Review 1463, "Anti-Trust Defenses of Pari Delicto and Unclean Hands;" Pennsylvania Water & Power Co. v. Consolidated Gas Electric Light & Power Co., 4 Cir., 1953, 209 F.2d 131, certiorari denied 1954, 347 U.S. 960, 74 S.Ct. 709, 98 L.Ed. 1104.

Under the aforesaid facts and circumstances, it is my conclusion that there is insufficient basis for a defense of In Pari Delicto on these motions.

### Injury and Damage

▇ The law is well settled that in order for a plaintiff to obtain a recovery in a private antitrust action he not only must prove violations, but he must plead and prove injury, e. g., Northwestern Oil Co. v. Socony-Vacuum Oil Co., Inc., 7 Cir., 1943, 138 F.2d 967, 970, certiorari denied 1944, 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081; Karseal Corporation v. Richfield Oil Corporation, 9 Cir., 1955, 221 F.2d 358, 362; Peller v. International Boxing Club, Inc., 7 Cir., 1955, 227 F.2d 593, 595. Therefore, in addition to establishing that the defendants have in some way violated the antitrust laws, the plaintiff must prove that the defendants' violation was a proximate cause of injury to it, and it must prove the extent of that injury.

▇ However, when a plaintiff complains and offers proof which may show that defendant's illegal acts caused him to lose business, evidence of injury may not be wholly separate from evidence of the injury's extent—damages. The testimony which tends, or may tend, to prove both, may consist of statements of what the plaintiff has earned in the past or estimates by experts of what the plaintiff would have earned in the absence of the defendant's alleged illegality. If a plaintiff has proved with sufficient probability that it would have profited but for the defendant's tort, it has generally by the same evidence proved with equal probability the amount of that profit. In other words, questions of proximate cause, injury and damage may, from the standpoint of proof, be one issue which cannot readily be split. In all likelihood, then, there are two possibilities:

(1) That the plaintiff has failed to prove both the fact and the amount of injury and, therefore, has no right to recover; or, on the other hand,

(2) That it has proved the fact and amount of injury, and if liability exists it should recover. See 52 Michigan Law Review, 363, 374–375, "The Treble Damage Bonanza; New Doctrines of Damages in Private Antitrust Suits," by Homer Clark.

In any event, the appropriate rule of proof of damages appears to be based on the line of cases including Eastman Kodak Company of New York v. South-

ern Photo Materials Company, 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Company v. Paterson Parchment Paper Company, 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; and Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L. Ed. 652.

The Eastman, Story and Bigelow cases appear to indicate generally that a jury may conclude as a matter of just and reasonable inference from the proof of defendant's wrongful acts and the tendency of such acts to injure plaintiff's business and from an evidence of decline in profits and values shown to be attributable to no other causes, that the defendant's wrongful acts caused damage to plaintiff. It is said that "the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652.

### Claims for Damages for Alleged Loss of Profits

■ Plaintiff presented an accountant, Samuel A. Spitz, who testified as to Plaintiff's Exhibit 97, referring to prospective estimated profits of the plaintiff based upon the alleged assumption that plaintiff in the absence of conditions of which it complained could have obtained more bananas and marketed them during the damage period. The exhibit shows the so-called "Actual" profit or loss of the plaintiff as computed by Spitz from plaintiff's books for the years in question. Compared with the "Actual" profit is another column for each of these years, entitled, "Capability." This computation as to "Capability" (of profit) is based upon a number of premises:

(1) That the plaintiff could have sold 862 cars as compared with the "Actual" number of cars, numbering 300 in 1950, 296 in 1951, 230 in 1952, 244 in 1953;

(2) That the cost of purchase per car would have been at the "Actual" figures shown by Spitz in Plaintiff's Exhibit 97, to wit, $1,580 in 1950, $1,557 in 1951, $1,547 in 1952, $1,581 in 1953;

(3) That the expenses of operation, particularly plant, selling and delivery— in fact all expenses other than officers' compensation—would have been at the calculated figures set forth in Plaintiff's Exhibit 97;

(4) That the purchasers from the plaintiff would have paid a markup at the price utilized by plaintiff's accountant.

The origin of the 862 car estimate is somewhat obscure. The accountant, Spitz, appears to have obtained it from Elbaum. Elbaum, in turn, it is claimed by the defendants, obtained this figure by adding 347 cars, which were processed in the New Haven plant in 1939 (then owned by Williams Brothers, for whom Elbaum was a temporary manager), to 515 cars, the highest number ever processed by plaintiff at its Hartford plant, which was in 1948. If the 862 car estimate was in fact derived in this way, it is invalid since this court rejected the 1939 figure as being too remote and for the further reason that the New Haven plant was not then owned or operated by the plaintiff. Elbaum testified that in his opinion, if he had been able to get them, he easily could have sold in the New Haven plant about three cars more a week, or about 156 cars more a year. This, he said, would bring his estimate to 876 cars, which he reduced to 862 cars because of a provision in the pre-trial order. This estimate of 862 cars, based upon Elbaum's opinion, was accepted for such weight as it might appear to warrant. If deemed reasonable, the jury were free to accept it; if unreasonable, they were free to reject it.

The following evidence tended to cast in doubt both the weight and credibility of Elbaum's testimony:

(1) There was a statement by one of defendants' witnesses that in January 1952 Elbaum had said he could not sell more than one carload of bananas a week;

(2) Further testimony that Elbaum at the same time—that is, January 1952—

said: "If I had known how limited that market was, I would never had opened up in Hartford;"

(3) The biggest year plaintiff had was in 1948, when it had a total of 720 cars for both plants—that is, New Haven and Hartford—including, however, the "quota" intended for First National Stores;

(4) Testimony as to plaintiff's refusal to accept bananas.

Nevertheless, this court cannot state that plaintiff's proof on the issue of lost profits was without any possible probative force.

### Claims for Injury for Alleged Loss of Goodwill Value

Plaintiff's Exhibit 100, prepared by the accountant, Spitz, computed the so-called "going concern value" of plaintiff as of September 3, 1950 at $829,488. In Plaintiff's Exhibit 101, Spitz computed this going concern value as of September 3, 1953 at $245,391, indicating a decline in value in the three-year period of $584,-097.

Spitz, in computing the 1950 value, omitted the statistics for 1950, and in computing the 1953 value he omitted the statistics for 1949. He justified these omissions by reason of the alleged acts of defendants, creating unusual variations in the profit trends. On cross-examination he conceded that if the 1950 fiscal facts had been included, the going concern value for 1950 would have been $703,793, and that if the 1949 figures were included in the 1953 estimate, the 1953 going concern value would have been $280,656, thereby resulting in a value decline of $423,137 instead of $584,097.

The estimates of Clarence K. Marion, an accountant who testified for the defendants, show that plaintiff's goodwill value as of September 3, 1950 was nothing. (S.M. 4870). He based his computations upon the diminishing returns of plaintiff's earnings per dollar of capital employed between the years 1946 and 1950, as shown on Defendants' Exhibit Q–3.

Thus, these opinion estimates differ widely, thereby presenting another area of factual dispute for jury determination.

### Claims for Damages for Alleged Overcharges

To establish injury and damages for alleged price overcharge, a plaintiff must show the quantities of the defendant's products purchased by it and the prices paid therefor, the existence and the amount of any illegal overcharge and that the overcharge was not passed on to plaintiff's customers.

When a plaintiff buys goods for resale, its claim for damages, based upon price overcharge, will generally fail in the absence of a showing that its margin of profit was reduced by the defendant's allegedly illegal price. See Clark Oil Co. v. Phillips Petroleum Co., 8 Cir., 1945, 148 F.2d 580, 582, certiorari denied 1945, 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437; Northwestern Oil Co. v. Socony-Vacuum Oil Co., Inc., 7 Cir., 1943, 138 F.2d 967, 969, certiorari denied 1944, 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081; Twin Ports Oil Co. v. Pure Oil Co., 8 Cir., 1941, 119 F.2d 747, certiorari denied 1941, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516.

Thus, in order to establish damages for price overcharge a plaintiff must prove:

(1) That the defendant illegally increased the price of plaintiff's supplies; and

(2) That plaintiff's selling price did not rise enough to compensate for the rise in cost so that there was no passing on of the alleged overcharge to plaintiff's customers. See 52 Michigan Law Review 363, 406, "The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits," by Homer Clark.

To attempt to show overcharges, Elbaum testified that he computed the total shipments of bananas to the plaintiff from Fruit Dispatch by years; that by using the total price paid by the plaintiff to Fruit Dispatch for such bananas, he obtained the average price per hun-

dredweight; that he computed the average price of Standard Fruit bananas (all of the Honduras and Gros-Michel varieties) on the Eastern seaboard and then, ascertaining the difference between the Standard Fruit price and the Fruit Dispatch price, multiplied this differential by the quantity purchased by him. This amounted to $55,843.

By a second method, using the same quantities of purchases in the respective periods by years, Elbaum compared average prices at seaboard of Fruit Dispatch Company shipments with the average prices of Standard Fruit at Eastern seaboard of all Honduras and Gros-Michel bananas, and arrived at another differential per hundredweight, which, when multiplied by the quantities, amounted to $78,858. Then taking a midway position between these two results, i. e., $55,843 and $78,858, he calculated his loss at $67,000. See Plaintiff's Exhibit 92–A; S.M. 1887–1888.

This calculation is subject to substantial criticism:

(1) The average price does not give full weight to the quantities purchased at the different periods under the allegedly varying prices of Standard and Fruit Dispatch;

(2) It appears that in the average price of Standard, Elbaum included specials, ripes and turners (S.M. 2065), while as to Fruit Dispatch prices he took the average of the prices he actually paid to Fruit Dispatch (S.M. 2065–2067), and it is possible that he compared the average price of a small quantity of Standard Fruit with the entire importations from United Fruit; (S.M. 2058–2069)

(3) Elbaum conceded that the best variety of United Fruit bananas ran better than Standard's best, the Frisco; (S.M. 1886)

(4) Defendants' Exhibit W–2 based on the original form as introduced by the plaintiff (Plaintiff's Exhibit 26) but augmented by the testimony of Mr. Albert E. Sawyer, a witness for the defendants, showed that the prices of bananas as charged by Standard Fruit during 1950, 1951 and 1952 at times were in excess of the $7.50 per hundredweight asked or charged by United Fruit during the greater part of this period.

(5) Defendants' Exhibit O–3 shows that the plaintiff, Banana Distributors Incorporated, at certain times during 1950, 1951, 1952 and 1953, paid as much, or more, to competitors than to Fruit Dispatch.

Nevertheless, the bottom half of Defendants' Exhibit S–3, which contains a graph representing plaintiff's markup on sales from 1949 through 1953, indicates that the markup on the cost of bananas sold by plaintiff decreased from 35.1% to 25.4%. (S.M. 4883). The fact that the markup diminished rather than remained constant may well be considered by the jury to give some indication as to the extent, if any, to which the alleged overcharge was not passed on by the plaintiff to its own vendees. However, it would seem that a much more accurate statement of alleged loss by plaintiff is available and should be employed in any retrial of this action.

Whatever the infirmities may be, the proof of the plaintiff amounted at least to some evidence on which to predicate jury consideration of a claim of overcharge. Whether or not this claim is reasonably asserted is a factual question for jury determination under the circumstances herein.

### Conclusion

The motions of the defendants, therefore, must be denied. The undetermined issues must be retried.

So ordered.